No. 26,352.

THE CHURCH OF GOD, Commonly Known as THE INDEPENDENT HOLINESS PEOPLE, et al., *Appellants,* v. RAY KIMBROUGH et al., *Appellees.*

No. 26,364.

THEO BERRYHILL et al., *Appellants,* v. GEORGE H. SMITH et al., *Appellees.*

SYLLABUS BY THE COURT.

1. RELIGIOUS SOCIETIES—*Consolidation—Evidence.* There was sufficient evidence to justify the court in finding that there had been a consolidation of two similar separate church organizations.

2. TRIAL—*Conduct of Trial—Passion or Prejudice.* There is nothing in the abstracts to show that the trial court was influenced by passion or prejudice.

Appeals from Bourbon district court; EDWARD C. GATES, judge. Opinion filed April 10, 1926. Affirmed.

*W. P. Dillard* and *Harry W. Fisher,* both of Fort Scott, for the appellants.

*James G. Sheppard,* of Fort Scott, *C. F. Newman,* of Springfield, Mo., and *S. J. McWilliams,* of Kansas City, Mo., for the appellees.

---

Appeal and Error, 4 C. J. p. 880 n. 2. Religious Societies, 34 Cyc. p. 1193 n. 93.

The opinion of the court was delivered by

MARSHALL, J.: Case No. 26,352 is one in ejectment; case No. 26,364 is one in replevin. The property involved was a newspaper printing plant and the real estate on which it was operated. The cases were tried together by the court without a jury, and a general finding was made in favor of the defendants in each case, and a judgment was rendered in their favor in each case. From that judgment the plaintiffs in each case appeal.

1. The dispute concerning the title to the property arises out of a controversy and division in the church organization. There was evidence which tended to prove the following facts: In 1882 a Protestant Christian church denomination was organized under the name of "The Church of God Independent Holiness People." The church organization grew until it had churches located in a number of states. In 1897 a dispute arose concerning the manner in which elders (ministers) should be tried when charged with misconduct, one side of the dispute contending that the elders should be tried by other elders, the other side contending that they should be tried by the church in which they were preaching. The dispute resulted in a division of the church and the organization of another Protestant Christian church denomination known as "The Church of God Unity." The old organization, "The Church of God Independent Holiness People," published a paper in Fort Scott named the *Church Advocate and Holiness Banner*. The later organization, "The Church of God Unity," also known as "The Unity Holiness People," published a paper in Kansas City, Mo., known as *The Church Herald*. "The Church of God Independent Holiness People" purchased the real property in controversy in case No. 26,352. On that property was a building which contained the personal property in controversy in No. 26,364.

In 1921 a movement was instituted to unite the two church organizations. This resulted in the appointment of a committee of ten, five from each of the churches, to effect a plan of union. That committee reported and recommended a combination of the papers and—

"That the title to the personal property to be used in the consolidated publishing work be retained by the respective boards of publication now holding it, no matter to what place removed or where located, and an accurate list of all such property used shall be kept in duplicate by each editor.

"That the real estate held by each body be left undisturbed for the ensuing year in charge of the present board of trustees holding them.

.    .       .       .       .       .       .       .       .       .       .       .       .       .

"That this joint committee be empowered to proceed with the necessary details of consolidation according to the above recommendations with [when] ninety per cent of our congregations voting shall have given a favorable vote on the same."

The proposition of uniting was submitted to the various churches of each organization, which resulted in seventy-one of the one hundred two churches of the Church of God Independent Holiness People voting in the affirmative, and one voting in the negative but afterward adhering to the union. The remainder of the churches of that organization failed to vote. All (thirty-six) of the churches of the "Church of God Unity" voted in favor of the union. The papers were then consolidated.

In 1922 each of these church organizations held separate conventions in Fort Scott. The Church of God Unity met one day in advance of the Church of God Independent Holiness People. Other than as above indicated, both conventions were held at the same time. The matter of union was discussed in each convention. After the conventions had been in session for some time, the Church of God Unity People went in a body to the building where the Church of God Independent Holiness People were in convention, and thereafter sat and voted in that convention. At the joint convention a resolution was proposed and adopted that "We unite on the Word of God alone." There ensued much confusion and debate, which continued until 2:30 in the morning.

Thereafter, the united churches secured possession of the real and personal property in controversy, and the plaintiffs commenced these actions. The judgment recites:

"Now on this 18th day of December, 1924, after hearing the arguments of counsel and being fully advised in the premises, the court finds and determines the issues in this case in favor of the defendants and against the plaintiffs."

The plaintiffs say:

"In the first place, we believe the court will agree with us that the question to be decided in this lawsuit is not a question of a schism in a church, but the question of whether there was a union of two churches."

The determination of these actions turns on whether or not there was a union of the two church organizations. That was a question of fact to be found from the evidence. The court found that fact in

favor of the defendants. The argument of the appellants is directed to the proposition that no union was effected. The court found otherwise on evidence which, as abstracted, this court thinks was sufficient to sustain the finding.

2. The appellants argue that the court was influenced by passion and prejudice against them. This argument is based on the following facts: During the trial, at the opening of an afternoon session of court after a witness had been called to the witness stand, a woman, not a party to either of the actions but an adherent to one side, arose in the back part of the court room and stated to the court that the matter being tried was very important and asked that they might pray. The court responded, "You may pray if you wish to." The woman then asked a man to pray, and he prayed. After his prayer another man prayed. When the matter was subsequently presented to the court on an application to correct the transcript so as to show what occurred at the time the prayers were made, the court said, "There was nothing that I thought that was offensive in the prayer, or at all partisan." The plaintiffs say:

"Appellants feel that the court should not have permitted this prayer meeting to be held. We believe in prayer, but we think there is a time to pray and a time to work, and appellants having heard the evidence introduced, the statements of the court in deciding the case, the statements of the court when he admonished the two peoples to get together, and having observed the court during the prayer service, are of the opinion that the court was influenced and prejudiced against the appellants herein, and that because of said passion and prejudice against them he failed to follow the law and the evidence in deciding the case."

The only things that should influence a court in the trial of a cause are the pleadings, the evidence, the argument of counsel, and the law. There is nothing in the abstracts to indicate that anything was said in the course of those prayers that might in any way have influenced the court in deciding these cases, or that the court was influenced by passion or prejudice.

The judgment is affirmed.

DAWSON, J. (dissenting): I construe the contract of merger to mean that it required an affirmative vote of 90 per cent of the 102 congregations of the older organization; 90 per cent of 102 is 91.8, so that an affirmative vote of 91.8, or practically 92 congregations, would have been required to consummate the merger; and the vote of 71 congregations was insufficient to accomplish it.

Furthermore the plan of union which the congregations were called upon to vote for or against was the proposed compact formulated by the joint committee of ten, and that compact was largely concerned with the disposition of the real and personal properties of the two congregations. That plan of union was thrown into the discard altogether by the resolution adopted by the joint convention: "We unite on the Word of God alone." That resolution did not make disposition of the properties of the two organizations.